UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**

  **Plaintiff,**

  v.                                                Case No. 22-CR-133-LA-SCD

**RAMONE J. LOCKE,**

  **Defendant.**

---

**ORDER DENYING DEFENDANT'S REQUEST FOR A *FRANKS* HEARING AND REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

---

Defendant Ramone Locke has been charged with possessing cocaine with the intent to distribute in connection with an investigation into an armed drug trafficking organization (ADTO). As part of the investigation, law enforcement obtained a warrant for surveillance of Locke's phone (the April 8 warrant). Locke now challenges the validity of that warrant. He first argues that fruits of the warrant (including subsequent warrants) should be suppressed because the warrant lacked probable cause. Next, Locke argues that even if the warrant did establish probable cause, that was only because the affiant lied and omitted key facts. As such, if the motion to suppress is denied, Locke requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to explore the veracity of the search-warrant affidavit. The government opposes the motions.

Because Locke has failed to make a substantial preliminary showing that the warrant was unlawful under *Franks*, he is not entitled to a hearing to challenge the veracity of the affidavit that law enforcement submitted to procure the warrant. Moreover, the totality of the

circumstances demonstrates that I, as the issuing judge, had a substantial basis for concluding that the affidavit established the requisite probable cause for a warrant. I will therefore recommend that Locke's motion to suppress be denied, and I will deny Locke's *Franks* motion.

**BACKGROUND**

I.     Affidavit[1]

In August 2021, law enforcement began investigating Alex Weddle and his armed drug trafficking organization. ECF No. 85-1 at ¶ 12. The team investigating this organization learned from a confidential informant that a dealer going by the nickname "A1" had been selling crack and powder cocaine for several years. *Id*. ¶¶ 13-14. A1 was identified as Alex Weddle. *Id*. ¶ 13. The informant provided law enforcement with several phone numbers that Weddle utilized to sell cocaine. *Id*. ¶ 15. Several days later, investigators met with a second confidential informant who confirmed that Weddle had been dealing cocaine for at least three years and regularly carried a firearm with him during such activity. *Id*. ¶ 20. This informant provided Weddle's most recently used phone number, which matched one of the numbers that the first informant provided. *Id*. ¶¶ 15, 21. One of the informants arranged a meeting with Weddle at the direction of law enforcement. *Id*. ¶ 25.

The informant took an undercover agent to purchase crack cocaine from Weddle and several associates (also co-defendants in this case) on September 1, 2021. *Id*. ¶ 27. In conducting business with the ADTO, the undercover learned that the ADTO utilized certain "customer phones" (including the number that the undercover had been contacting) in shifts,

---

[1] Because Locke's challenge to the warrant is based on the validity of the April 8th affidavit, I will present the facts of the case as presented in that affidavit, ECF No. 85-1.

meaning that the ADTO member working a shift would manage several phone numbers, triage calls, and arrange sales based on calls received during that shift. *Id.* ¶¶ 12, 34

Between September 2021 and February 2022, the undercover developed a relationship with Weddle as he conducted ten drug buys from him and other associates. *Id.* ¶¶ 35-75. The investigation also allowed law enforcement to connect Weddle to several more of his associates and their phone numbers. One of these associates was Weddle's girlfriend, defendant Mack-Howard. *Id.* ¶ 59. Law enforcement noticed that Mack-Howard contacted a number ending in 7500 frequently. *Id.* ¶ 76. Investigators queried the number in Milwaukee County Jail (MCJ) records and found a recorded call on which they could hear Weddle's voice speaking from the 7500 number. *Id.* ¶¶ 77-78. MCJ records showed that Weddle answered MCJ calls on the 7500 number seven times between September 2020 and September 2021, and MCJ inmates called the 7500 number 128 times between April 2020 and November 2021. *Id.* ¶¶ 79-81.

Investigators determined that the 7500 number was a "customer phone" used by the ADTO. *Id.* ¶ 82. They also determined that Weddle tended to use this phone himself. *Id.* ¶¶ 82-87. On March 9, 2022, the undercover received his first communication from the 7500 number, a text message simply stating "around," which the undercover took to mean they had cocaine to sell if he was interested in buying. *Id.* ¶¶ 90-91. The undercover asked to whom the number belonged, aware that the number was a customer phone of the ADTO but also aware that the ADTO would not know that he knew. *Id.* ¶ 90. The number texted back saying it was "A1 & A2/Rican [a nickname for defendant Perez-Ramirez] lol this our other number." *Id.*

The undercover and Weddle met on February 22, 2022, to conduct another buy. The undercover wore a wire to the meeting to record their conversation. *Id*. ¶¶ 94-96. During this meeting, the undercover and Weddle discussed potentially working together to buy cocaine from Weddle's supplier in larger amounts so as to obtain a lower per-unit cost. *Id*. ¶ 96. The affidavit also states that Weddle "advised [the undercover] to get an iPhone," because "he and his ADTO exclusively utilized iPhones because they communicate on FaceTime." *Id*. ¶ 97. The affidavit further explained that the undercover "knows through training and experience that using iPhones FaceTime and iMessage to communicate can assist in evading law enforcement." *Id*.

As part of its investigation into Weddle, law enforcement applied for a warrant for iCloud records for the 7500 number, now knowing that the ADTO conducted business over FaceTime. Magistrate Judge Joseph authorized the search of Apple iCloud records associated with the 7500 number. *Id*. ¶ 113. Apple provided only three weeks' worth of data, the period between February 1 and February 22, 2022. *Id*. ¶ 114. While there were records of many different numbers making *phone* calls to the 7500 number (378 different numbers), there were only fifteen numbers that made *FaceTime* calls. *Id*. ¶ 114. The undercover examined the top five most-contacted numbers and determined that all except one of these numbers belonged to known members of the ADTO. *Id*. ¶ 115. The other phone number (the 7810 number) belonged to Locke. It had made fifteen FaceTime contacts with the 7500 number during that three-week period. *Id*. ¶¶ 115-116. After learning that the number belonged to Locke, the undercover looked into Locke's criminal history and found that Locke had a criminal history involving drug trafficking. *Id*. ¶ 117. This history included a 2009 conviction for drug possession with intent to deliver, a 2010 conviction for drug possession, a 2012 federal

conviction for money laundering, and a 2020 federal conviction for use of a communication device to facilitate drug trafficking. *Id*. The undercover also learned that Locke had recently used the 7810 number to communicate with his son, Ramone Locke Jr., who was being detained in the Milwaukee County Jail for suspected drug trafficking. *Id*. ¶ 118. Locke Junior had been apprehended by law enforcement on March 30, 2022, after being caught in a vehicle with 40 grams of cocaine, multiple machine guns, and approximately 6.87 grams of marijuana. *Id*.

The undercover listened to a recorded jail call between Locke and Locke Junior. *Id*. ¶ 119. On this call, the Lockes discussed whether Locke Junior said anything to law enforcement, and Locke advised his son to stay quiet and not use the phone because law enforcement would listen to Locke Junior's phone calls to find something incriminating. *Id*. ¶¶ 119-120. The Lockes also discussed the details of Locke Junior's arrest. *Id*. ¶ 121. Of particular note, Locke asked Locke Junior if he could obtain the keys for the car and if "the stuff" was out of the car. *Id*. Locke also asked if Lewis, an accomplice caught with Locke Junior, had ever been to jail, and Locke Junior responded that he had not been, but also that Lewis "didn't say shit" to law enforcement. *Id*. ¶ 122. The affiant interpreted this to mean that Locke was "concerned that Lewis, not having prior experience being questioned by law enforcement may provide statements/information that would be incriminating of Ramone Locke Jr., Ramone Locke Sr. or possible other members of the ADTO." *Id*.

ATF Special Agent Alexander Erlien submitted the above information in an affidavit in support of a request for a search warrant. Based on the information in this affidavit, I authorized a warrant (the April 8th warrant) for electronic surveillance of Locke's phone. *See id.*, at 1 (22-m-390).

## II. Events Leading to Locke's Arrest

Later in April, the undercover spoke with Weddle over FaceTime, and Weddle showed the undercover what appeared to be a kilogram of cocaine. ECF No. 82 at 9. Based on overlapping cell-site information, agents believed it was likely that Weddle had obtained the kilo from Locke and then called the undercover. *Id*. This information was used to support several additional warrant applications. *Id*. These warrants also echoed the same statement from the April 8 affidavit: "when [the undercover] met with Alex Weddle on February 22, 2022, Alex Weddle informed [the undercover] that he communicated with his cocaine source via FaceTime." *Id*.

Based on the location tracking on his vehicle (an Audi), law enforcement learned that Locke's vehicle traveled to Chicago on May 30, 2022 and remained there for about a week. At approximately 8:52 pm on June 7, agents saw Locke leaving Chicago in the Audi. *Id*. Once he crossed into Wisconsin, police stopped Locke and a K9 alerted to the presence of drugs. Police conducted a full roadside search of the Audi and eventually located a hidden compartment containing what appeared to be 2 kilograms of cocaine. *Id*. at 12.

## MOTION TO SUPPRESS

### I. Applicable Law

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The court's duty in reviewing a search warrant and its supporting materials is limited to ensuring "that the magistrate had

a substantial basis for . . . [concluding] that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) (internal citations omitted). In other words,

> a magistrate's determination of probable cause is to be "given considerable weight and should be overruled only when the supporting affidavit, read as a whole in a realistic and common-sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated."

*United States v. Pritchard*, 745 F.2d 1112, 1120 (7th Cir. 1984) (quoting *United States v. Rambis*, 686 F.2d 620, 622 (7th Cir. 1982)). Even "doubtful cases should be resolved in favor of upholding the warrant." *Rambis*, 686 F.2d at 622.

"When an affidavit is the only evidence presented to a judge in support of a search warrant, the validity of the warrant rests solely on the strength of the affidavit." *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003). "A search warrant affidavit establishes probable cause when it 'sets forth facts sufficient to induce a reasonable prudent person to believe that a search thereof will uncover evidence of a crime.'" *United States v. Jones*, 208 F.3d 603, 608 (7th Cir. 2000) (quoting *United States v. McNeese*, 901 F.2d 585, 592 (7th Cir. 1990)). In deciding whether an affidavit establishes probable cause, "courts must use the flexible totality-of-the-circumstances standard set forth in *Illinois v. Gates*, 462 U.S. 213, 238 (1983)." *McNeese*, 901 F.2d at 592. Applying the totality-of-the-circumstances standard, the question is simply whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Thus, "[i]n dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175 (1949).

## II. Discussion

Locke concedes that the affidavit established probable cause that Weddle used FaceTime to communicate with his supplier. *See* ECF No. 82 at 14. However, Locke contends that the affidavit did not support a particularized suspicion that *Locke* was Weddle's supplier, so there was no probable cause to search Locke's phone records.

Locke's motion rests on a false premise, however, in that he believes the warrant must have contained probable cause that Locke was the supplier of drugs for the drug trafficking organization being investigated. The warrant didn't need to establish that Locke was the *supplier* of drugs at all. Instead, it merely needed to establish that evidence of a crime would be found in the proposed search, a much more general standard. Fed. R. Civ. P. 41(c)(1). One suspects that Locke has framed the question thus because if we ask the *correct* question—was there probable cause that Locke's phone information would include evidence of illegal activity?—the answer, obviously, is yes. The warrant affidavit establishes a strong likelihood that Locke was involved with Weddle in the ADTO (whether as a supplier or not is wholly irrelevant) and thus that evidence of criminal activity would be found in information about Locke's phone and location activity. In short, Locke was communicating with a known drug dealer on a medium known *generally* to be used for evading law enforcement and *specifically* to be used by that dealer's own organization. And Locke wasn't a fleeting presence—he was one of the top five communicators with Weddle on that medium, with the other four being known drug numbers within the ADTO. If that weren't enough, Locke also had a significant criminal past involving drug activity, which undercuts any reasonable innocent explanation for the clandestine communications. That's all the probable cause the Fourth Amendment requires.

### A. FaceTime records

First, the FaceTime records themselves strongly suggest that the contact between Weddle and Locke related to the ADTO's activity. For one, the sheer number of contacts suggests that the relationship between Locke and Weddle was not a "mere propinquity" that only tenuously connected Locke to a known dealer. It would be one thing if the government merely pointed to a few phone calls between the two and tried to establish guilt by fleeting association. *See e.g.*, *Ybarra v. Illinois*, 444 U.S. 85 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.") Instead, the affidavit states that Locke was one of the most frequently contacted people from a phone number used *specifically* for the drug trade. The iCloud account connected to the 7500 number—a phone number that law enforcement knew Weddle used in a "business" rather than personal context—contacted Locke fifteen times over the brief three-week period for which law enforcement had FaceTime records. Specifically, Locke was the fourth most contacted number with fifteen FaceTime calls. This many calls within a brief three-week period supports an inference that Locke was not merely a casual acquaintance of Weddle's. Furthermore, because these contacts involved a shared phone number used by multiple members of the ADTO rather than Weddle's personal number, these calls were much more likely to be "business" calls than personal chats between friends. In other words, it wasn't just that Locke was connecting with Weddle in some general sense—he was connecting with one of Weddle's drug trafficking organization's numbers.

Moreover, the fifteen contacts between the 7500 number and Locke within the three-week period were not regular phone calls, they were FaceTime calls. Locke seems to gloss over this fact, but the means of communication is highly relevant in this case. While in many

instances there may not be anything inherently suspicious in a person's decision to call someone over FaceTime rather than making a normal phone call or sending a text message, here the affidavit suggests we should in fact harbor a great deal of suspicion. Considering (1) Weddle's statements that the ADTO only used FaceTime, (2) his statements that the ADTO used FaceTime specifically to evade surveillance like wiretaps, and (3) the fact that the phone number regularly contacting Locke was a *shared phone of the ADTO* and not Weddle's personal number, the frequent contact of any party over FaceTime from this phone could reasonably be expected to produce evidence of criminal activity.

What's more, paragraph 115 of the affidavit established that the *other* callers within the top five most frequent FaceTime contacts were all individuals or phones connected to the ADTO. As the affidavit explains, the 7500 number's top five most frequent FaceTime numbers were:

| Telephone Number | Toll Count: | Individual(s) associated with telephone number: |
|---|---|---|
| (414) 627-7500 | 112 | ADTO "customer phone" |
| (414) 807-4375 | 37 | Janicia MACK-HOWARD |
| (414) 323-9313 | 24 | Alex WEDDLE |
| (414) 578-7810 | 15 | Ramone LOCKE |
| (414) 378-0169 | 6 | Alex WEDDLE |

(ECF No. 85-1, ¶ 115.) What this list appears to show is that the iCloud account for the 7500 number called the 7500 phone (described as a "ADTO customer phone") some 112 times over the three-week period. The second highest number of contacts comes from co-defendant Mack-Howard's 4375 number. The affidavit describes Mack-Howard as being involved in the conspiracy to distribute controlled substances and the girlfriend of Weddle. The 9313 number was one of Weddle's many phones, as was the 0169 number.

Locke's appearance in the "top five" FaceTime contacts is thus highly suggestive. It's not merely that he had frequent contacts with Weddle on FaceTime—although that is

suggestive in its own right. It's that he communicated with Weddle in the same fashion that the *other* ADTO contacts communicated with him. When all four of the other top FaceTime contacts are associated with the ADTO, it's reasonable for the affiant and reviewing judge to conclude that the fifth number—Locke—was *also* involved in the ADTO in some capacity. To illustrate the point, it would be quite different if the affidavit listed the other four top FaceTime contacts as "Mom," "Grandpa," "Aunt Patty," and "Cousin Fred." No incriminating inference could be drawn from a link to such a group. However, when the affidavit describes all four other top contacts as known ADTO numbers, it's reasonable to believe that Locke's presence among that group was strongly suggestive of his involvement in the ADTO.[2]

### B.     Criminal history

The affidavit also established that Locke had a significant criminal history. Standing alone, "prior convictions will not by themselves establish probable cause for a search," but they "can be relevant and retain some corroborative value." *United States v. Carswell*, 996 F.3d 785, 792 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has found that a defendant's prior convictions may "cast doubt on any innocent explanations" for suspicious activity. *United States v. McDuffy*, 636 F. 3d 361, 364 (7th Cir. 2011). As such, Locke's convictions for dealing and possessing drugs in 2009 and 2010, money laundering in 2012, and using a communication device to facilitate drug trafficking in 2020 are relevant to the

---

[2] Locke also asserts that because the 7500 number contacted fifteen different phone numbers in the three-week period, even assuming Weddle was communicating with his supplier over FaceTime, this "only established a one-in-fifteen chance that Locke was Weddle's supplier." ECF No. 82 at 17. Locke follows this up by admitting that "the probable cause standard is incapable of quantification into percentages," and he is right. There is no reason to quantify likelihoods and probability in this way, particularly because, again, Locke and the 7500 number had *fifteen contacts*, four of the more frequently contacted numbers were known participants in the ADTO, and the other ten numbers contacted Weddle no more than five times.

extent that they support law enforcement's suspicion that Locke and Weddle communicated over FaceTime to facilitate drug trafficking. This is particularly true given the discussion in section A immediately above. Locke is implicitly suggesting that it would have been more reasonable to draw the conclusion that Locke's communications on FaceTime were of an innocent nature. It's certainly *possible* that a frequent FaceTime contact of a known drug dealer who used FaceTime to communicate with his drug organization could be someone totally unconnected to illegal activity. It could be a friend or cousin. But when the contact is shown to have a significant criminal history—a history which likely distinguishes him from more than 99% of individuals who lack such a history—that drives another nail in the coffin of the story that the communications could have been innocent.

### C. Locke Junior

Finally, Locke's son's then-recent arrest for dealing cocaine fills out the picture in a fashion that supports the government's suspicions. In Locke's recorded conversation with Locke Junior, Locke demonstrated some concern for whether "the stuff" could be retrieved or if Locke Junior could obtain the keys to the stolen vehicle in which Locke Junior was busted with a large quantity of drugs and several machine guns. ECF No. 85-1, ¶ 119-120. The quoted portions of the call indicate that Locke seemed most concerned with whether his son told law enforcement anything and whether Lewis, who was arrested with Locke Junior, would talk. The impression is that this was not a conversation between a concerned father and his incarcerated son. Instead, it appears to be evidence that Locke was considering his own exposure due to his possible involvement in his son's alleged drug-dealing activity.

In sum, I conclude that the face of the warrant provided more than sufficient information to establish probable cause that evidence of a crime would be found by obtaining records and information associated with Locke's cell phone number.

## MOTION FOR A *FRANKS* HEARING

Locke asserts that even if the warrant contained probable cause on its face, that's because law enforcement supplied false information and omitted other key information. He seeks a hearing to establish these assertions.

### I. Applicable Law

A defendant is entitled to a *Franks* hearing if he can "make a substantial preliminary showing (1) that the warrant application contained a material falsity or omission that would alter the issuing judge's probable cause determination, and (2) that the affiant included the material falsity or omitted information intentionally or with a reckless disregard for the truth." *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019). "If sufficient allegations existed warranting the search irrespective of the affiant's alleged errors, a hearing is unnecessary and the motion should be denied." *United States v. Mullins*, 803 F.3d 858, 862 (7th Cir. 2015).

"The defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations, and the claim of falsity should be substantiated by the sworn statements of witnesses." *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013) (citing *Franks*, 438 U.S. at 171). In other words, "a defendant must put forth 'an offer of proof' that is 'more than conclusory' and gestures toward more than negligent mistakes. . . . What is needed is 'direct evidence of the affiant's state of mind' or else 'circumstantial evidence' of 'a subjective intent to deceive.'" *United States v. Daniels,* 906 F.3d 673, 677 (7th Cir. 2018) (quoting *United States v. Glover,* 755 F.3d 811, 820 (7th Cir. 2014)). "To obtain a hearing, the

defendant must also show that if the deliberately or recklessly false statements were omitted, . . . probable cause would have been absent." *McMurtrey*, 704 F.3d at 509 (citing *Franks*, 438 U.S. at 171–72). Accordingly, "*Franks* hearings are rarely required." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009).

## II. Discussion

### A. The alleged misrepresentation

The key offending statement, in Locke's view, is the following statement in paragraph 113 of the April 8 warrant affidavit: "It is important to note that when [the undercover] met with Alex Weddle on February 22, 2022, Alex Weddle informed [the undercover] that *he communicated with his cocaine source via FaceTime*." ECF No. 85-1 ¶113 (italics added). He asserts that this is materially false and was made with deliberate disregard for its falsity. What Weddle actually said was: "me and my people do business off iPhone because when you FaceTime . . . they can't get you, they can't tap a FaceTime." ECF No. 82 at 5 (quoting what Weddle actually said). Locke believes that because Weddle never used the term "source," the affiant went too far when he summarized the above statement to suggest that Weddle communicated with his *source* on FaceTime.

First, although it may be true that Weddle never specifically said that he used FaceTime to communicate with his "source," he did say more generally that "my people do business" on FaceTime because "they can't tap a FaceTime." It's a fair enough inference that whoever supplied the drugs to the ADTO would be one of his "people"—particularly given the *purpose* of using FaceTime, which was to evade detection. Locke never explains why we should believe that the source of a ADTO would *not* use FaceTime when other members would. What sense would that make? Instead, a fair reading of what Weddle said would allow

someone to reasonably conclude that *all* members of the ADTO—runners, drivers, phone answerers, and drug sources—relied on FaceTime to communicate. That the affiant inferred the specific statement from the more general one does not render the statement false.

Even if the statement were untrue, however, it wouldn't matter because Locke's argument once again rests on the false premise that his status as a "source" was crucial to the probable cause determination. It wasn't. As discussed above, the affidavit needed merely to show that Locke could be *involved* in drug trafficking, not that he played some specific role in the organization. That means we can excise the affiant's allegedly false statement about the "source" without impacting probable cause. The reader of the affidavit would still know that the ADTO communicated over FaceTime and that Locke had repeated FaceTime contact with the ADTO. All of the other most frequent contacts were ADTO phones, and there's no reason to believe Locke was somehow different. Locke also had a history as a drug dealer, and he was recorded in an apparent discussion about drug dealing with his son. These facts support an inference of Locke's involvement in the ADTO whether Locke was in fact a source or merely a low-level dealer reporting to Weddle. Regardless of Locke's actual position in the hierarchy, there was probable cause that evidence of a crime would be found. As such, the alleged misrepresentation relating to the source was not material.

### B. Alleged Omissions

Similarly, the alleged omissions from the April 8th affidavit were not material to the finding of probable cause. The three alleged omissions are as follows: first, records suggesting that the fifteen FaceTime calls between Locke and the 7500 number each lasted zero seconds; second, phone records showing only three phone contacts between Locke and the 7500 number outside of the February FaceTime records; and three, there were other phone

numbers with a high number of contacts with the 7500 number that law enforcement did not target.

For starters, Locke has provided no evidentiary support for these factual assertions. The phone records are not attached as exhibits, nor are they anywhere else in the record. Furthermore, Locke has also failed to provide any evidence, direct or circumstantial, from which I could infer that such information was omitted recklessly or with a subjective intent to deceive. Finally, even without seeing the purportedly omitted evidence, there is nothing to suggest that it is material to the finding of probable cause.

Putting those stumbling blocks to one side, I find that the government more than adequately explains its reason for the first omission, which related to the length of the FaceTime contacts. The government has submitted the declaration of a technical expert who swears that Apple does not keep records of call times, which means that the "zero seconds" length of the calls shown in the records does not actually mean that they lasted zero seconds. *See* ECF No. 92-4. We simply don't know how long they lasted, which means the government did not materially omit this information. The government's declaration explaining this also does not run afoul of *United States v. Harris,* 464 F.3d 733 (7th Cir. 2006) or *McMurtrey*, 704 F.3d 502, as Locke alleges. In *Harris*, the court held that the government could not submit supplemental affidavits with new information to establish probable cause. 464 F.3d at 736. In *McMurtrey*, the court also found that the government could not submit evidence to explain away contradictions within the affidavit outside of a *Franks* hearing. 704 F.3d at 509. That is not what the government has done. Here, there are no internal contradictions or discrepancies about what different parties said or did, and the government is not trying to bolster its case for probable cause. The government has submitted objective evidence about the technical

capacity of Apple records to explain that Apple records *cannot* prove call duration, and for that reason, it reasonably did not provide call duration information in the affidavit.

The same holds true for the other phone record data that Locke has mentioned (but again, not provided). There was no need for the government to mention that Locke and Weddle had only occasional phone calls prior to February 2022 because the contact that was specifically relevant to the investigation was FaceTime contact, not phone calls. As already discussed at length, law enforcement suspected that *FaceTime* contact with the ADTO phones was more likely to be internal communications within the ADTO, so they focused their investigations on numbers contacted over FaceTime. There was no need to mention phone calls. In addition, Locke provides no reason to believe that the four numbers that Weddle allegedly contacted more frequently than Locke's were from a shared ADTO device like the 7500 number. Perhaps Locke is referencing calls from Weddle's personal phone from which Weddle could have been FaceTiming family; we do not know, because Locke does not provide the records supporting these allegations. Because there are no records to review, I cannot determine that those omissions were material, so Locke is not entitled to a *Franks* hearing.

Furthermore, while Locke complains that the affidavit should have mentioned there were only three phone contacts between Locke and Weddle between January 2021 and February 2022, that limited *phone* contact actually supports the government's view of things. Law enforcement had a year's worth of phone records for the 7500 number and only three weeks of FaceTime records. Locke appeared so infrequently in the phone records that law enforcement apparently did not suspect him of any participation in the organization until it obtained FaceTime records showing extensive contact. As Weddle explained to the

undercover, this is precisely why the ADTO used FaceTime—FaceTime allowed participants to stay under the radar because phone records are generally more accessible by law enforcement than FaceTime records. In short, the limited phone contact and extensive FaceTime contact supports the government's view, as confirmed by Weddle himself, that FaceTime was the go-to medium for ADTO communications, *not* phone calls. Any omission regarding phone contacts was therefore wholly immaterial.

### C. Alleged *Franks* Violations in the May 10, May 18, and June 3 Warrants

Finally, Locke also asserts that the warrants issued on May 10th, May 18th and June 3rd were invalid because they contained material omissions. Locke concedes that his challenge to the May 10th affidavit relies on invalidating the April 8th warrant, an effort I have rejected above. The subsequent two warrants are a bit different, however. The May 18 and June 3 warrants omitted certain phone records that Locke thinks are significant. In short, Weddle and the undercover were discussing how Weddle had shorted him during their latest deal. Weddle promised he'd call his supplier to let him know. During the timeframe when we'd expect Weddle to be making that call to his supplier, Weddle *did* call Locke, which Locke concedes makes it look like he was the source. However, Locke says that Weddle's phones *also* made multiple phone calls to *other* numbers during that timeframe. His point is that if Weddle contacted other people during the time when we'd expect he was calling his supplier, that now makes it less likely that *Locke* was that supplier. The supplier could have been one of those other contacts. As such, in his view, the affidavit should have included that information.

However, Locke does not supply any information suggesting that *Weddle* was making these alleged calls on Weddle's ADTO phones, many of which appear to have been operated

by ADTO associates working in shifts. He just says that Weddle's *phones* made several calls. That's not enough to show materiality. Just as importantly, Locke's challenge again rests on the premise that the affidavits are valid only if they identify Locke as the *source* of drugs, but that's not true. Even if the missing phone records could prove that Weddle made more calls than the affidavits let on, that does not undermine the conclusion that Locke was involved in the ADTO. Probable cause continues to exist regardless of whether he was the source.

## GOOD FAITH

Above I concluded that the warrant established probable cause on its face. I further concluded that the affiant did not misstate or omit any material facts. Therefore, I also conclude that the good faith exception would apply in the event that probable cause were found lacking. A defendant may rebut a showing of good faith by demonstrating "that the affiant intentionally or recklessly misled the judge." *United States v. Woolsey*, 535 F.3d 540, 546 (7th Cir. 2008) (citing *United States v. Leon*, 468 U.S. 897, 923 (1984); *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007)). The defendant has not made that showing here. Accordingly, even if the warrant were found inadequate, I conclude that the good faith exception would apply.

## CONCLUSION

For all the foregoing reasons, Ramone Locke's request for a *Franks* hearing, *see* ECF No. 82, is **DENIED**, and it is further **RECOMMENDED** that Locke's motion to suppress evidence, ECF No. 82, be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(A), (B), and (C), Fed. R. Crim. P. 59(a) and (b)(2), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any order or recommendation herein, or part thereof, may be filed within fourteen days of the date of

service of this order and recommendation or prior to the final pretrial conference, whichever is earlier. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the district judge in writing.

Dated at Milwaukee, Wisconsin, this 22nd day of March, 2023.

STEPHEN C. DRIES
United States Magistrate Judge