# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                                    Case No.  22-CR-133-LA-SCD-1

RAMONE J. LOCKE, SR.,

     Defendant.

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION TO SUPPRESS

On June 7, 2022, a narcotics dog named Zeke sniffed Ramone Locke's vehicle and alerted to the presence of controlled substances. ECF No. 84 at 2–3. Officers searched the vehicle and discovered a hidden compartment containing over two kilograms of cocaine. *Id.* The United States has since charged Locke with possession of and intent to distribute cocaine, as well as conspiracy related thereto. ECF No. 21. On January 6, 2023, Locke filed a motion to suppress the fruits of the search on his vehicle, challenging the probable cause afforded by the dog.[1] ECF No. 84. The court held an evidentiary hearing on Zeke's reliability on September 28, and the briefing is now complete and ready for a decision. For the reasons below, I conclude that Zeke's alert provided probable cause for the search of Locke's vehicle. Accordingly, I will recommend that Locke's suppression motion, ECF No. 84, be denied.

---

[1] Locke filed a separate motion to suppress other evidence that day as well. ECF No. 82. I issued a report and recommendation denying that motion on March 22, 2023. ECF Nos. 105–06.

**I.   Zeke and his handler**

Deputy Michael Allard (Zeke's handler) joined the Racine County Sheriff's Office (RCSO) in January 2017 and began participating in the canine assistant program in the summer of 2018. Tr. Evid. Hr'g, ECF No. 133 at 11:20–25, 13:1–15. In 2021, the RCSO selected Deputy Allard for the canine unit and sent him to Southern Police Canine, Inc. (SPC), a dog-training facility in North Carolina. *Id.* at 13:16–14:7. The RCSO previously purchased dogs from SPC. *Id.* at 15:17–21. SPC breeds its dogs in Hungary for specific "drives," consistent with law enforcement tasks. *Id.* at 166:16–167:20. At eleven to twelve months of age, satisfactory dogs arrive at SPC's facility and engage in sixteen to eighteen weeks of training in basic detection, obedience, and tracking. *Id.* at 169:4–170:2. If successful, dogs move on to matching and training with a new handler during SPC's next course. *Id.* at 170:3–15.

Deputy Allard arrived at SPC for the training course in mid-July 2021. *Id.* at 16:1–9. During the six-week course, he and Zeke progressed from bonding to article searches, to tracking and narcotics detection. *Id.* at 16:6–24:5. Deputy Allard also explained that SPC's training featured written tests and extensive field work, including "blind" scenarios, in which even the canine's handler does not know where narcotics have been hidden. *Id.* at 23:1–24:5. On August 27, 2021, Deputy Allard and Zeke received a certificate of successful completion for SPC's course in "patrol/narcotics detection." *Id.* at 24:17-19; Govt.'s Ex. 1.

Upon their return to Wisconsin, Deputy Allard and Zeke completed a three-day integration training with the RCSO. ECF No. 133 at 26:17–27:13. This integration training essentially mirrored the regular monthly training held for the RCSO's canine unit. *Id.* at

27:10–28:2. The RCSO holds two eight-hour trainings each month for members of the canine unit to maintain proficiency with various aspects of patrol, such as narcotics detection and building or vehicle searches. *Id.* In addition, SPC's owner Mark Mills travels to Wisconsin to "recertify" dogs annually. *Id.* at 36:24–37:10. Mills estimated that over fifty SPC alumni dogs are currently operating in Wisconsin. *Id.* at 164:13–15. Even though less than one year passed from Zeke's original training program until the sniff in question, he and Deputy Allard had the opportunity to complete a three-day "recertification" program with Mills in May 2022, just a month before the stop at issue here. *Id.* at 37:7–17. This program involved setups with scenarios similar to what RCSO used itself in its internal training, including blind searches and clean areas (areas without any hidden drugs). *Id.* Beyond the formal programming, Deputy Allard testified that he also conducts informal on-duty training to keep Zeke active during slower nights on the job. *Id.* at 31:10–18. Deputy Allard maintains extensive and detailed records of Zeke's on-duty training in addition to his field deployments. Govt.'s Exs. 5–9.

## II. The stop and sniff

Prior to the traffic stop in question, federal agents were investigating Locke in connection with an armed drug-trafficking organization in Milwaukee. ECF No. 138 at 2–3. The agents asked the RCSO to conduct a traffic stop on Locke on June 7, 2022. *Id.*; ECF No. 84 at 2. Once officers detained Locke, Deputy Allard deployed Zeke around the exterior of Locke's vehicle. *Id.* at 3. According to Deputy Allard, Zeke alerted to the presence of contraband in the vehicle. *Id.* Officers searched the vehicle and eventually discovered a hidden compartment containing a substance that field-tested positive for cocaine. ECF No. 138 at 4. Officers obtained a search warrant for the rest of Locke's vehicle, which allowed them to

access the hidden compartment and recover approximately two kilograms of cocaine. ECF No. 84 at 3.

## PROCEDURAL BACKGROUND

A grand jury indicted Locke for knowingly possessing cocaine with intent to distribute. ECF No. 12. A superseding indictment added a charge for conspiracy. ECF No. 21. The matter is assigned to United States District Judge Lynn Adelman for trial and to me for resolving pretrial motions. *See* 28 U.S.C. § 636; Fed. R. Crim. P. 59; E.D. Wis. Gen. L. R. 72. On January 6, 2023, Locke filed a motion to suppress all evidence obtained from the officers' search of his vehicle. ECF No. 84.

Locke advanced two theories in support of his motion: (1) Zeke's sniff of his car was a search under the Fourth Amendment for which there was no probable cause, and (2) even if the sniff was not a search, Zeke lacked the credibility necessary to provide law enforcement with probable cause to search. *See id.* On March 24, 2023, I issued an order regarding the first argument, concluding that a dog sniff is not a search and therefore did not require probable cause. ECF No. 107. As to the second argument, I granted Locke's request for an evidentiary hearing to challenge Zeke's credibility pursuant to *Florida v. Harris*, 568 U.S. 237 (2013). *Id.* In the interim, the government filed a supplemental brief asserting that the collective knowledge doctrine justified the officers' search regardless of Zeke's alert. ECF No. 111. I rejected that argument, ECF No. 121, so the hearing on Zeke's credibility proceeded on September 28, 2023. ECF No. 133.

During the evidentiary hearing, the government presented testimony from Zeke's handler, Deputy Allard, and from Zeke's original trainer, SPC's Mark Mills. Mills is a former police officer who founded SPC in 1989. *Id.* at 160:23–161:5. Mills estimated that SPC has

4

trained over two thousand dogs, and its customer base includes various federal, state, and local law enforcement agencies. *Id.* at 163:17–164:11. Mills explained that most states do not have standards for police dog certifications. *Id.* at 178:19–179:14. However, Mills is familiar with national certifying organizations like the United States Police Canine Association (USPCA) because he was a charter member of the USPCA and previously served as a judge for this organization. *Id.* at 163:1–3, 177:19–22. Mills also helped found the North Carolina Police Dog Association (NCPDA) in the 1990s. *Id.* at 201:3–10. Despite the NCPDA's state-specific focus, Mills described the NCPDA as a national certifying organization because its membership stretches beyond North Carolina. *Id.* at 179:12–14.

Locke called two expert witnesses during the evidentiary hearing: Jerry Potter and Michael Pennington. Potter is a retired Navy veteran who works in canine consulting. *Id.* at 233:13–18. Potter primarily testified as to national certifying procedures and industry training standards. *Id.* at 233:8–308:6. Pennington is a retired police officer from Ohio who has owned his own company training police canines since 2007. *Id.* at 88:15–91:4. Pennington testified regarding a dog's ability to distinguish between marijuana and legal hemp products. *Id.* at 88:10–122:11.

After the evidentiary hearing, Locke filed a brief in support of his motion, ECF No. 135, the government filed a brief in opposition, ECF No. 138, and Locke filed a reply brief, ECF No. 141.[2]

---

[2] Several scheduling conflicts with expert witnesses gave rise to a substantial delay in holding the evidentiary hearing.

5

## DISCUSSION

"A dog's alert on a car can give probable cause to search the entire car. Indeed, a good dog's alert can provide a rebuttable presumption of probable cause to search." *United States v. Simon*, 937 F.3d 820, 833 (7th Cir. 2019). "A defendant, however, must have an opportunity to challenge . . . evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Harris*, 568 U.S. at 247. Locke maintains that Zeke was unreliable and, therefore, that his alert failed to establish probable cause to search Locke's vehicle. ECF No. 135 at 2. Locke challenges Zeke's reliability from several angles—arguing Zeke never achieved proper certification, did not receive adequate routine training, and performed poorly in both controlled vehicle drug sniffs as well as in the field. *Id.* Locke also alleges that the recent legalization of hemp precludes reliance on alerts from marijuana-trained dogs like Zeke. *Id.* at 3–4. The government maintains that Zeke's certification, training, and performance were more than adequate, and that the legalization of hemp does not alter a drug dog's reliability. ECF No. 138 at 27–33.

*Harris* governs the analysis here. There, the Supreme Court unanimously found that the Florida Supreme Court had erred by requiring the state to produce certain dog training and certification records before probable cause could be established. 568 U.S. at 242–43. The court chastised the Florida Supreme Court for its requirement of a "strict evidentiary checklist, whose every item the State must tick off." *Id.* at 244. Instead, the court held that we should look to the totality of the circumstances, where a "gap as to any one matter . . . should not sink the State's case" if the deficiency can be compensated for by the "overall reliability" of the dog. *Id.* at 245. In short, courts should rely on the "fluid concept" of probable cause, which rejects "rigid rules, bright-line tests, and mechanistic inquiries in favor of a more

6

flexible, all-things-considered approach." *Id.* at 244. "The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 248.

Applying these principles, the court had no trouble finding that Aldo, the dog in question, was "up to snuff." *Id.* Aldo had completed a 120-hour program in drug detection and had been certified by an independent (for profit) company, although the certification had expired by the time of the search. *Id.* Aldo and his handler had completed more recent training one year prior to the search at issue, and they had spent some four hours per week "on exercises designed to keep their skills sharp." *Id.* The record therefore "amply" supported probable cause. *Id.*

I.     **SPC is a Bona Fide Organization.**

Locke first challenges the certificate Zeke received from SPC. ECF No. 135 at 11. Under *Harris,* if a dog is certified by a "bona fide organization," that certification would create a rebuttable presumption of probable cause in the dog's alerts. 568 U.S. at 246–47 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."). Zeke and Deputy Allard received a certificate of achievement after completing SPC's six-week onsite training program on August 27, 2021. Govt.'s Ex. 1.



SPC also conferred an additional "certificate" to Deputy Allard on May 20, 2022, after he and Zeke completed a three-day "recertification" in Wisconsin.[3] Govt.'s Ex. 4.

The *Harris* court did not define "bona fide organization." Locke believes a bona fide organization must be an independent third party rather than a party involved in training the animal. ECF No. 135 at 11. In Locke's view, SPC has a vested interest in claiming Zeke is a qualified narcotics dog, and so Deputy Allard could not rely on any purported certification from SPC. *Id.* at 11–15. Locke cites guidance from various organizations counseling that certifications should not be performed by evaluators who trained or sold the dogs being certified. *Id.* Locke also cites the *Harris* court, which noted the dog there had obtained a certification from "an independent company." *Harris*, 568 U.S. at 248.

Locke's point is valid, as far as it goes: SPC is not a completely neutral evaluator of Zeke's detection skills. After all, SPC bred and trained Zeke, and so it's understandable that

---

[3] Locke points out that the May 2022 "certificate" only names Deputy Allard and not Zeke. ECF No. 135 at 3. But the testimony reflects that Deputy Allard completed that program with Zeke. ECF No. 133 at 183:16–18.

it would have some kind of vested interest in its dog's success. However, I am not convinced that the definition of "bona fide organization" need be drawn so narrowly as to preclude any entity involved in a dog's training. In *Harris,* for example, that the dog was "independently" certified was merely a fact of the case. *See id.* And, in fact, that dog's certification had *expired. See id.* The court made no special mention either of the "independent" certification or the fact that it had expired, which suggests the court was not intending to place strict limits on what might constitute a bona fide organization. *See id.* As for the recommendations of dog-certifying organizations, no court has held that best practices within a given industry necessarily dovetail with the requirements of the Fourth Amendment. *Id.* at 244 ("We have rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach.")

Locke's insistence on third-party certification also ignores the fact that in a free market, *all* entities that sell products—whether soup, washing machines, or police dogs—have "vested" interests in producing products of a certain quality. Thus, many companies have their own quality control departments and make myriad claims about their own products' quality. These claims are not blindly accepted at face-value, however, as the market will punish companies that produce poor-quality products. In short, SPC would likely go out of business if it certified dogs with poor detection skills, and yet the company not only appears to have a very positive reputation in the police community, it retains the ability to sell its dogs to law enforcement, including federal agencies, for the lofty sum of $15,000 apiece. ECF No. 133 at 193:18–21.

Although I do not suggest that officers may or should rely solely on market forces to evaluate the quality of a dog's original training, it's hardly a novel concept: the *Harris* court

recognized law enforcement's own vested interest in having high-quality dogs, pointing out that "law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources." 568 U.S. at 247. Here, Deputy Allard knew that his department was a repeat customer of SPC, and he testified that "they like that vendor because they've produced successful and loyal dogs." ECF No. 133 at 15:19–21. Deputy Allard was thus able to rely partly on the fact that his own department, which had a "strong incentive to use effective training and certification programs," had already vetted SPC as a bona fide trainer of quality detection dogs.

Finally, it's notable that the dog at issue in *Harris* was itself certified by "a private company that specializes in testing and certifying K–9 dogs." 568 U.S. at 241 (italics added). The court made no remark about the company's "private" status as a for-profit entity. Just like companies that train dogs, companies that certify dogs also have a vested interest in pleasing their customers. However, the court did not seem to find that disqualifying, or even worthy of mention.

In sum, it appears that there are many kinds of organizations that might reasonably be relied upon in varying degrees to certify dogs. Conflicts sometimes exist, but under the circumstances here, any such conflict would not preclude a reasonable officer from relying on SPC's certification of Zeke's skills. I will therefore adopt the well-recognized definition of "bona fide," meaning "sincere" or "genuine." *See Griffin v. Lockhart*, 935 F.2d 926, 929 n.2 (8th Cir. 1991) (observing that "bona fide" has many applications in the law but "it is generally used according to its dictionary definition—that is, meaning '[a]cting or done in good faith; sincere, genuine'"); *see also* Black's Law Dictionary, "Bona Fide" (11th ed. 2019)

10

(explaining that the phrase translates to "in good faith" and means "made in good faith; without fraud or deceit" or "sincere; genuine"). Because SPC is engaged in the legitimate, genuine business of training and certifying narcotics dogs, it qualifies as a bona fide organization.[4] The evidence shows that SPC had been in the dog-training business for decades and its business is built on reputation and repeat customers like the Department of Defense, Racine County Sherriff's Office, the Oak Creek Police Department, and Milwaukee County Sheriff's Office. ECF No. 133 at 163–64, 195–96. SPC's owner has been involved in dog training since the 1980s and gives roughly fifteen seminars around the country every year on the subject, demonstrating that he and his dogs enjoy a solid reputation throughout the law enforcement community. *Id.* at 161–62. Ultimately, none of the evidence presented suggests that SPC's certificates of completion were not legitimate evaluations of Zeke's drug detection skills, nor that the failure to obtain a certification from an independent third party impacted Zeke's reliability.

## II.  Zeke performed satisfactorily in recent training programs.

In addition to SPC's qualifications to issue a certificate, Locke also challenges the substance behind the certificates Zeke received. ECF No. 135 at 3, 12. He contends that the SPC "certificate" merely commemorates *participation* in programs without confirming Zeke's *performance* in those programs. *Id.* To the contrary, however, Mills credibly testified that the certificates represent successful completion of SPC's program requirements. ECF No. 133 at 182:11–23. In fact, Mills shared that SPC's written and practical tests require a score of eighty

---

[4] Of course, whether SPC is a bona fide organization is hardly dispositive. Under *Harris,* a dog should be certified by a bona fide organization *or* complete a training program. 568 U.S. at 246 ("evidence of a dog's satisfactory performance in a certification *or* training program can itself provide sufficient reason to trust his alert." (emphasis added)) Here, as I conclude below, Zeke's training program was adequate, and he performed well in both field and controlled settings. Deputy Allard would therefore have been entitled to rely on Zeke's alert even without any kind of certification.

11

percent to pass. *Id.* at 175:3–18. Mills also disclosed that he has previously failed potential handlers, including from Wisconsin. ECF No. 133 at 175:23–24, 176:8–15. The fact that dogs and their handlers must pass certain evaluations in order to receive a "certificate" from SPC strongly suggests that these documents are not mere attendance awards. Notably, Mills held a three-day training in Wisconsin and handed out the certificates after personally observing the dogs, which again suggests they were more meaningful than Locke suggests. ECF No. 133 at 37. Ultimately, I conclude that the SPC certificates reflect evidence of satisfactory performance, not mere attendance.

Locke also challenges the standards SPC applied throughout its narcotics training. As the Seventh Circuit has acknowledged, there are no national standards by which to judge a canine training program. *United States v. Bentley*, 795 F.3d 630, 637 (7th Cir. 2015). The *Bentley* court looked favorably, however, on the fact that the program in question modeled its standards after the leading national associations in the field. *See id.* Here, Mills credibly testified that SPC's program *exceeds* the standards set forth by national associations like the USPCA, as well as the North American Police Work Dog Association and National Police Canine Association. ECF No. 133 at 176:21–178:18. Mills and Deputy Allard testified generally regarding the methods of training and testing employed by SPC—such as scenario changes, distractors, and blind and blank hides. *Id.* at 37:11–38:1, 171:8–174:2. In *Harris*, the Supreme Court expressed a desire to see exactly these types of training. *See* 568 U.S. at 249 (questioning whether the training "simulated sufficiently diverse environments and whether they used enough blind testing (in which the handler does not know the location of drugs and so cannot cue the dog)"). Given the context provided at the evidentiary hearing, the August

2021 and May 2022 "certifications" from SPC provide evidence of Zeke's satisfactory performance in two recent training programs. *See Harris*, 568 U.S. at 246–47.

## III.    Zeke engaged in successful training with his handler.

Locke also challenges the monthly training that Zeke and Deputy Allard conducted outside the auspices of SPC. Deputy Allard testified that his department has an unwritten rule that members of the canine unit need to complete sixteen hours of training per month, which the department facilitates by holding two eight-hour training sessions each month. ECF No. 133 at 27:15–21, 28:16–20. Deputy Allard testified that he and Zeke participated in this in-service training every month except for one month during which Deputy Allard's child was born. *Id.* at 30:5–9.

### A. Amount of training.

Locke argues that the amount of time Zeke and Deputy Allard spent in training never actually came close to sixteen hours of training per month. ECF No. 135 at 6. Specifically, the "sixteen hours" per month that Deputy Allard cites merely reflects the total time he and Zeke spent "at" training sessions rather than the time Zeke spent performing actual training exercises. *Id.* at 7. For example, during a an eight-hour training session on April 28, 2022, Zeke took part in six training exercises, each of which lasted between about two and fifteen minutes, for a grand total of less than one hour of exercises during an "eight hour" program. Def.'s Ex. 187. Thus, Locke believes Deputy Allard's records vastly overstate the amount of training Zeke actually received. *See* ECF No. 135 at 6.

Although Locke's calculations appear correct, he has not supplied any precedent or reason to believe that a dog's required training should be defined solely by the number of minutes the dog is engaged in specific exercises. A recent district court case from Louisiana

13

strongly supports the contrary view. *United States v. Smith,* No. 6:20-CR-00246-01, 2022 WL 16570060, at *8 (W.D. La. Sept. 30, 2022), report and recommendation adopted, No. 6:20-CR-00246-01, 2022 WL 16558734 (W.D. La. Oct. 31, 2022). There, as here, the defendant protested that the dog's training was insufficient because it was "only sniffing during each training session for mere minutes," but the court disagreed and adopted the government's broader view that training should *not* be limited to "nose time":

> [Defense expert] Mr. Heyen opined that Thor's training records were incomplete and that he had insufficient training, because training records show that he was only sniffing during each training session for mere minutes. Based on Mr. Heyen's calculation, Thor had only trained for two hours and thirty-four minutes throughout the entire year of 2020. . . .

> [Government expert] Sgt. Nope discredited Mr. Heyen's calculation of Thor's training as based on "nose time," or the length of time the dog is actually sniffing. Sgt. Nope stated that such a calculation is a skewed statistic in law enforcement dog training practices, because it does not consider setup, preparation, takedown, research, interview, and other time periods associated with deployment of a dog. . . . Further, although SWGDOG recommendations state that a canine team shall complete a minimum of sixteen hours of training per month, *the guidelines do not define training as a value of nose time or limit the training requirement by type* (i.e. narcotics, apprehension, etc.) as Mr. Heyen suggests.

*Id.* (italics added).

Here, as in *Smith,* the record supports the government's more expansive definition of training. It's true that the example training Locke cited during the evidentiary hearing (April 28, 2022) included six training exercises, ranging from apprehension bite exercises to article and narcotics searches, each lasting between two and fifteen minutes. Def.'s Ex. 187. But Locke has not explained how the training could have been more extensive than it was. The training records reflect rather detailed training scenarios involving multi-level buildings, car stops with decoy arrestees who "resist" arrest, and search sites with multiple buildings. In one

14

narcotics exercise, which lasted fifteen minutes, narcotics were hidden in no fewer than five different places. Def.'s Ex. 187. Deputy Allard summarized the exercise as follows:

> My K9 was able to locate and final alert on each of the following hides by aggressively scratching at the target locations:
>
> -45.1 g Heroin in book shelf w closed face 3rd from the bottom
> -20.4 g MDMA in floor heat register on W side of chapel
> -13.2 g Meth under wood end table in chapel on the NE side
> -240.3 g Marijuana inside pantry area on the top shelf approx.. 5 ft. high
> -109.3 g Cocaine inside tabernacle with cross on it in side room off of pantry room.
>
> There were multiple clean areas that were sniffed between each positive alert. K9 did not alert in any clean areas. The above listed narcotics were in sealed plastic bags.
>
> After each final alert K9 was rewarded with a non scented canvas bag and praise.

*Id.* at 3.

It's obvious from these records that although each exercise might take only a few minutes for the dog and handler to complete, many of them involve elaborate setups with multiple kinds of narcotics hidden in challenging places. Some exercises involve staged arrests in complicated situations like traffic stops or chaotic buildings. It is difficult to imagine how it would be feasible for law enforcement to create even more scenarios of that nature within the specified time. Accordingly, it's understandable that the *Smith* court rejected the idea of "nose time" in favor of a broader definition of training.

Deputy Allard testified that training encompasses more than just exercises. At a typical training session, there might be eight different dogs present along with their handlers. ECF No. 133 at 30:25–31:9, 154:3–155:21. Deputy Allard explained that trainings of this sort—combined scenario work, discussion, feedback about other dogs, and video review—is accepted policy at the RCSO. *Id.* And Mills' testimony also reflects that it is common practice

15

for training time to include other activities like setup and discussions for the handlers. *Id.* at 228:21–229:16. Moreover, as Deputy Allard testified, dogs work in "short bursts of energy" and "need time to rest." ECF No. 133 at 154:11–13. "If we were to do drug detection or apprehension work for a full timed eight hours per day, it's not possible." *Id.* at 154:13-15.

Based on the record, there is no indication that the amount of training Zeke undertook is not commensurate with training that typical police dogs receive, even if the actual time spent performing exercises is just a fraction of the total time "in" training. No court has suggested that "nose time" is the only acceptable definition of training. Notably, Locke has not pointed to another jurisdiction that calculates training time based on the narrow method he now advances. Accordingly, I conclude that Zeke's training time has been adequate.

### B. Training content.

Locke also contends that Zeke's training should have been more focused on narcotics detection and specifically on open-air sniffs of vehicles, which was his bread and butter as a police dog. ECF No. 135 at 8–9. According to Locke, approximately eighty percent of Zeke's field work over the eight months leading up to Locke's arrest involved vehicle sniffs for drugs, but only nine percent of Zeke's on-duty training in the six months leading up to arrest focused on narcotics detection. *Id.* (The other training involved assisting officers with arrests, subduing decoy-suspects and locating suspects.) Moreover, Locke points out that Zeke's on-duty training in the six months leading up to arrest reflects only forty-five minutes of exercises involving vehicles. *Id.* at 9.

Defense expert Potter testified that a patrol dog's training would be quite varied but that it should focus on areas of deficiency and then turn to the most utilized skills. ECF No. 133 at 251:8–252:9. Zeke's accuracy rates do not indicate a deficiency in narcotics

16

detection, but his field focus on vehicle sniffs does suggest that he could benefit from more training time devoted to this skill. Although more significant time would bolster Zeke's credibility, these statistics do not undermine the reliability of his alert. *See United States v. Acosta*, No. 18-CR-2050-CJW, 2019 WL 454247, at *14 (N.D. Iowa Feb. 5, 2019) (finding the complete absence of training records for several months weighed adversely on a narcotics dog's reliability). And, as demonstrated below, Locke has not demonstrated Zeke's performance was prejudiced by any kind of training deficit, as Zeke performed well both in controlled settings and in the field.

## IV.    Zeke performed adequately in controlled settings.

Locke also argues that Zeke's alert was unreliable because he performed poorly in controlled vehicle drug sniffs during practice sessions. ECF No. 135 at 2. Locke contends that Zeke failed each of his three on-duty training exercises involving drug sniffs of vehicles in the six months leading up to Locke's arrest. *Id.* at 10. But Locke's assertion of "failure" is akin to criticizing a batter who goes four-for-five at the plate. According to Deputy Allard's training log, on March 28, Zeke did alert to one vehicle that did not contact narcotics. But Zeke alerted to four vehicles that did contain different narcotics and he correctly declined to alert on other "blank" vehicles sniffed between each positive alert. Def.'s Ex. 179. Zeke had a similar performance when he failed to alert to a vehicle containing heroin on May 19, 2022. Def.'s Ex. 189 at 4. But although Zeke missed that alert, he correctly alerted to three other vehicles, while declining to alert on one other vehicle that did not contain drugs. Def.'s Ex. 189. These statistics certainly do not represent "failed" training exercises, nor do they render Zeke's alerts unreliable. The takeaway from reviewing the training records is that Zeke occasionally alerts when there are no drugs (in one case when drugs had been placed in a car during a previous

17

exercise, Def.'s Ex. 188 at 2), and sometimes misses an alert when there are drugs (including a heroin hide that *all* dogs had missed -- "no one had alerted it on all day," Def.'s Ex. 189 at 3). But overall, Zeke usually found drugs when they were present and declined to alert when they weren't. His performance was enough to justify Deputy Allard's confidence in his alerts.

## V.    Zeke also performed well in the field.

Locke also contends that Zeke's reliability is undermined by poor accuracy in real-life situations. ECF No. 135 at 17. Further, despite the *Harris* court's conclusion that we should not place too much emphasis on field results, he asserts that Zeke's allegedly weak field performance should fatally undermine the credibility of his alert. *Id.* at 19–20.

Since Zeke joined the RCSO, officers recovered contraband twenty-two times out of the thirty-one open-air alerts Zeke provided, which translates to a field accuracy rate of approximately seventy-one percent. *Id.*; ECF No. 138 at 32. Given that the probable cause standard is not even *fifty* percent, Zeke's alerts were sufficiently reliable on their face. *See Bentley,* 795 F.3d at 636 ("Lex's 59.5% field-accuracy rate . . . is good enough to support a finding of his reliability and thus to allow his alert to constitute a significant piece of evidence supporting the ultimate conclusion of probable cause.")

Not so fast, says Locke: he has drilled down into the data and says that, for some of the twenty-two "accurate" alerts, the police recovered only small amounts of marijuana or just "shake"—the remnants of stems and leaves leftover from the marijuana plant. ECF No. 135 at 17–18. The premise of Locke's argument is that police must recover a certain threshold amount of contraband—he does not say exactly what that magic amount is—before they can "count" that alert as being correct. He also says that we shouldn't count alerts if no prosecutions resulted from the alerts. *Id.* at 18. I will reject Locke's invitation to undertake an

18

*ex post facto*, sniff-by-sniff mini-trial to determine the legitimacy of each alert, which is exactly the sort of "mechanistic inquiry" the Supreme Court has rejected. *See Harris*, 568 U.S. at 244. In short, if a dog says there are drugs in a car, and the police find drugs in the car, that should suffice under the "common sense" analysis of the Fourth Amendment. *Id.* at 248. If anything, the fact that Zeke is apparently able to sniff out very small quantities of drugs bolsters his credibility.

Even if Zeke's field performance were as weak as Locke claims, the Supreme Court has observed that we should not rely too heavily on real-life results because "[t]he better measure of a dog's reliability thus comes away from the field, in controlled testing environments." *Id.* at 246. That's because in real-life situations the drugs could have been too well hidden (never discovered by police), the quantities could have been too small for officers to locate, or the dog may have smelled residual odors from drugs that had been in the vehicle but since removed. *Id.* But Locke contends that Zeke's field rates *are* relevant here because there is insufficient evidence to support any of the three reasons *Harris* identified for *not* relying on field rates. ECF No. 135 at 18. Specifically, the government provided no evidence to indicate there were hidden compartments or residual odors in the vehicles that came up empty. *Id.* Although that's true, Locke is again engaging in exactly the kind of flyspecking that the *Harris* court unanimously rejected. There is simply no authority to suggest that police departments must devote scarce resources to undertaking rigorous post-mortems after every dog alert so they can later explain "why" the police did not find drugs. Instead, the *Harris* court was simply making observations about the *general* limitations of field data, not suggesting that police departments must be able to explain every specific situation.

19

Finally, Locke further suggests that even if some alerts were explained by residual odors, that would actually undermine Zeke's credibility because probable cause should be based on *current* illegal activity, not the detectible remnants of past drug activity. ECF No. 135 at 18–19. But probable cause is not so limited: evidence that drugs *were* in a vehicle makes it much more likely that they *are* in the vehicle presently. Police are not bound to assume that previous drug use or transport was a one-off event. And neither must they ignore a dog's alert simply because there is some chance the drugs are no longer present. Probable cause simply means there is a reasonable chance drugs would be found at the time of the search.

Ultimately, Zeke's alert statistics in the real world are strong. Locke's efforts to undermine them, and then to say that their unreliability should be controlling, are unpersuasive.

## VI. Zeke's training in marijuana does not negate the reliability of his alert.

Finally, Locke argues that Zeke's training in marijuana detection precludes the possibility of probable cause arising from his alerts because *legal* hemp products may be triggering some of Zeke's alerts. ECF No. 135 at 20–22.[5] In this case, I have already rejected an iteration of this argument, finding that the mere possibility that an alert is triggered by a *legal* product like hemp does not transform the sniff into a search. *See* ECF No. 107. And in a recent unrelated case, *United States v. Young,* No. 23-CR-42 (E.D. Wis. Oct. 20, 2023), I rejected a similar argument as well. By way of analogy, I noted that there are millions of toy guns in this country designed to look like real guns. *Young*, No. 23-CR-42, ECF No. 38 at 21.

---

[5] Defense witness Pennington testified that he conducted tests in which dogs trained to alert to marijuana alerted to CBD but dogs that were not trained on marijuana did alert to CBD. ECF No. 133 at 93:2–15. The government questions the reliability of these findings because Pennington could not definitively explain how dogs alert to marijuana—i.e., whether the alert is based on the presence of cannabidiol or THC. ECF No. 138 at 34; *see also* ECF No. 133 at 111:14–21. Ultimately, this evidence suggests—but does not prove—that dogs trained in marijuana may also alert to the presence of legal hemp products.

From a distance, such guns would be indistinguishable to any police officer. The fact that there is a mere *possibility* that the gun is fake does not destroy probable cause that a known felon is carrying a gun illegally. The same holds true here. Even if it's true that legal hemp is indistinguishable from marijuana, that fact merely introduces some small modicum of doubt into the mix, like a dash of water into a tumbler of scotch. The drink remains potent.

Moreover, as I observed in my last order on this subject, ECF No. 107, Locke has not demonstrated that dogs alerting to legal hemp is such a common occurrence that dog sniffs are routinely exposing large numbers of citizens to searches that reveal only their legal possessions. *See United States v. Plancarte*, No. 22-CR-64-WMC, 2023 WL 3944888, at *7 (W.D. Wis. Feb. 10, 2023) (observing "that the defendant had presented no evidence and no argument about how common it is that hemp is found in a vehicle in the absence of other controlled substances"). According to Deputy Allard, Zeke trained to alert to cocaine, methamphetamine, marijuana, and ecstasy at SPC, and he trained in fentanyl upon returning to Wisconsin. ECF No. 133 at 19:3–7. Even with legal hemp in the mix, Zeke's alert "would still give rise to a high probability that a controlled substance is in the car." *See United States v. Deluca*, No. 20-8075, 2022 WL 3451394, at *5 (10th Cir. Aug. 18, 2022). Therefore, the legalization of hemp does not materially undermine a reliable drug dog's alert.

* * *

Zeke was bred and selected for his ability to become a police dog. He was trained by a well-regarded dog-training facility for months, and he engaged in weeks of training with his handler, Deputy Allard. Zeke's successful completion of SPC's original and follow-up training programs occurred less than a year prior to his alert on Locke's vehicle. He performed well both in training and in the field, as evidenced by copious departmental records.

Ultimately, Locke's challenges persuade me merely that Zeke's training regime and detection skills are not infallible. But the probable cause standard is much lower, and here "all the facts surrounding [Zeke's] alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248. Therefore, Zeke's "sniff is up to snuff." *Id.* Based on this conclusion about Zeke's reliability—as well as those regarding the nature of a sniff and the collective knowledge doctrine, ECF Nos. 107 and 121, I will recommend that Locke's suppression motion, ECF No. 84, be denied.

## CONCLUSION

For all the foregoing reasons, the court **RECOMMENDS** the district judge **DENY** the defendant's motion to suppress, ECF No. 84. The court directs the parties' attention 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Crim. P. 59(b), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any recommendation herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation. Objections must be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the district judge in writing.

**SO ORDERED** this 29th day of December, 2023.

STEPHEN C. DRIES
United States Magistrate Judge