UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

**UNITED STATES OF AMERICA,**
    **Plaintiff**

v.                                                                                                        Case No. 22-CR-133

**RAMONE J. LOCKE, SR.**
    **Defendant**
_____

## DECISION AND ORDER

Defendant Ramone Locke filed a motion to suppress evidence obtained during a search of his vehicle. Police undertook the search following an alert by a drug-detecting dog, which is ordinarily sufficient to establish probable cause, but defendant argued the dog was unreliable. The magistrate judge handling pre-trial proceedings held an evidentiary hearing, then issued a recommendation that the motion be denied. Defendant objects. My review is de novo. Fed. R. Crim. P. 59(b).

### I. FACTS AND BACKGROUND

The magistrate judge's report sets forth the factual and procedural background of the case in detail. I present an abridged version herein.

On June 7, 2022, federal agents investigating defendant's alleged drug trafficking activities asked the Racine County Sheriff's Office (RCSO) to stop defendant as he drove from Chicago to Milwaukee. Following the stop, Deputy Michael Allard deployed his dog, Zeke, around the exterior of defendant's vehicle. The dog alerted to the presence of contraband, and officers conducted a search, locating a hidden compartment containing cocaine.

1

The RCSO obtained Zeke from Southern Police Canine, Inc. (SPC), a North Carolina company that breeds, trains, and sells dogs to law enforcement agencies. SPC breeds dogs in Hungary for specific "drives" consistent with law enforcement tasks. Dogs that fail to demonstrate the requisite characteristics—and most do not—are removed from the program. Dogs that pass this first stage are sent to SPC's facility in North Carolina, where they are trained by SPC personnel for 16 to 18 weeks. If the dogs graduate from the second phase, they are matched with a law enforcement handler to engage in a six-week training course, which culminates in a final test before certification in narcotics detection from SPC.

Deputy Allard and Zeke completed the six-week training course at SPC in the summer of 2021. On returning to Wisconsin, they completed an additional three-day integration training within the RCSO, and in October 2021, they completed a three-day training with the Wisconsin Law Enforcement Canine Handler Association (WLECHA). SPC's owner, Mark Mills, travels to Wisconsin annually to recertify dogs, and Allard and Zeke completed a three-day recertification program with Mills in May 2022. Per RCSO policy, the canine unit completes two eight-hour training sessions each month, and Allard conducts informal on-duty training to keep Zeke active during slow nights. Zeke is trained to alert to cocaine, methamphetamine, marijuana, ecstasy, and fentanyl.

Before the magistrate judge, defendant argued (1) that Zeke's sniff of the vehicle constituted a search for which there was no probable cause, and (2) that even if the sniff was not a search, Zeke lacked the reliability needed to provide probable cause for the officers' search. The magistrate judge rejected the first argument, citing long-standing Supreme Court precedent regarding dog sniffs. Illinois v. Caballes, 543 U.S. 405, 410

(2005) (holding that a dog sniff during a lawful traffic stop was not a search); United States v. Place, 462 U.S. 696, 707 (1983) (holding that a sniff by a well-trained narcotics-detection dog is not a search because it discloses only the presence or absence of narcotics, a contraband item). However, the magistrate judge granted an evidentiary hearing on the second issue, at which the government presented testimony from Allard and Mills. Defendant called Jerry Potter, a canine consultant, who testified about certification and training standards, and Michael Pennington, a retired police officer and owner of a dog training business, who testified that dogs cannot distinguish between (illegal) marijuana and legal products like CBD or hemp.

In post-hearing briefing, defendant challenged Zeke's certification, training, and performance in controlled settings and in the field. The magistrate judge concluded that Zeke's certification came from a bone fide organization (SPC), rejecting defendant's argument that only an independent, third-party could provide certification; that SPC's certification issued based on performance, not mere participation; that Zeke received a sufficient amount of ongoing training; and that Zeke performed adequately in controlled settings and in the field (with a field accuracy rate of about 71%). Finally, the magistrate judge concluded that, even if drug detecting dogs like Zeke cannot distinguish marijuana from hemp, the mere possibility that a sniff will reveal a legal item does not transform all sniffs into searches and did not materially undermine the reliability of Zeke's alert here.

## II. PROBABLE CAUSE STANDARDS

A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present. United States v. Simon, 937 F.3d 820, 833 (7th Cir. 2019).

3

Probable cause is a practical, common sense standard, involving the totality of the circumstances and requiring less than a preponderance of the evidence. Id.

"A dog's alert on a car can give probable cause to search the entire car. Indeed, a good dog's alert can provide a rebuttable presumption of probable cause to search[.]" Id. As the Supreme Court explained in Florida v. Harris,

> evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

568 U.S. 237, 246-47 (2013).

> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed,[1] may sometimes be relevant, as the Solicitor General acknowledged at oral argument. See Tr. of Oral Arg. 23-24 ("[T]he defendant can ask the handler, if the handler is on the stand, about field performance, and then the court can give that answer whatever weight is appropriate"). And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause--if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.

> In short, a probable-cause hearing focusing on a dog's alert should proceed much like any other. The court should allow the parties to make their best

---

[1] The Court noted that field data may not capture a dog's false negatives, as officers will usually not bother to search if the dog fails to alert. Conversely, if a dog alerts to a car in which officers find no drugs, the dog may not have made a mistake at all; the drugs may be too well hidden for the officers to find, or the dog may have smelled residual odor of drugs previously in the car. Id. at 245.

4

case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. In all events, the court should not prescribe, . . . an inflexible set of evidentiary requirements. The question--similar to every inquiry into probable cause--is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

Id. at 247-48.

## III. DISCUSSION

In his objections, defendant first argues that previous Supreme Court decisions holding a dog sniff is not a search were based on the premise that dogs alert only to the presence of contraband. He contends that, because dogs like Zeke cannot distinguish between illegal marijuana and legal hemp or CBP products, their sniffs are searches. Second, defendant argues that even if Zeke's sniff was not a search, the alert was not reliable enough to establish probable case because Zeke was not sufficiently trained or certified, and Zeke is unable to tell the difference between legal and illegal substances. (R. 151 at 2.)

### A.	Should Sniffs be Deemed Searches?

Defendant characterizes his first argument as purely legal: Caballes does not apply here because Zeke's alert does not reveal only the presence of contraband, which renders the sniff a search. He contends that the magistrate judge accepted that dogs trained to alert to marijuana cannot distinguish between illegal marijuana and legal hemp and CBD products, which should have been dispositive. (R. 151 at 6-7.)

5

Defendant faces an uphill climb in making this argument, as it would require me to disregard a long line of Supreme Court and Seventh Circuit caselaw holding that dog sniffs are not searches. See United States v. Johnson, 93 F.4th 383, 387 (7th Cir. 2024) ("[T]he Supreme Court has held that a dog sniff is not a search and so does not implicate the Fourth Amendment."). It is not the role of a lower court to overrule a decision of the Supreme Court, or to anticipate such an overruling by the Justices, even where subsequent decisions or factual developments appear to have undermined the rationale for the Court's earlier holding. United States v. Duncan, 413 F.3d 680, 684 (7th Cir. 2005). Indeed, it appears defendant's argument has been rejected by federal district courts, including one in this circuit. See, e.g., United States v. Plancarte, No. 22-CR-64, 2023 U.S. Dist. LEXIS 91812, at *14-15 (E.D. Wis. Feb. 10, 2023), adopted, 2023 U.S. Dist. LEXIS 90338 (E.D. Wis. May 23, 2023); United States v. Gomez, No. 21-CR-407, 2022 U.S. Dist. LEXIS 52909, at *6 (W.D. Tex. Mar. 24, 2022); United States v. Hayes, No. 19-CR-73, 2020 U.S. Dist. LEXIS 71818, at *69-71 (E.D. Tenn. Feb. 21, 2020). Defendant cites no decision accepting his legal contention.

Defendant contends that his argument will not require courts to disregard <u>all</u> dog sniffs, just those performed by canines trained on marijuana; some law enforcement agencies no longer use such dogs. (R. 151 at 8.) I agree with Plancarte: while defendant raises a legitimate question, he is nevertheless propounding an extreme change in the law. 2023 U.S. Dist. LEXIS 9812, at *15-17.

Even if I were inclined to chart new ground on this issue, the factual predicate for defendant's argument is not as strong as he contends. Defendant states that it is uncontested that drug dogs cannot distinguish between illegal marijuana and legal hemp

6

or CDB products (R. 151 at 3), but the magistrate judge made no such finding. He wrote, in pertinent part:

> Defense witness Pennington testified that he conducted tests in which dogs trained to alert to marijuana alerted to CBD but dogs that were not trained on marijuana did [not] alert to CBD. The government questions the reliability of these findings because Pennington could not definitively explain how dogs alert to marijuana—i.e., whether the alert is based on the presence of cannabidiol or THC. Ultimately, this evidence suggests—but does not prove—that dogs trained in marijuana may also alert to the presence of legal hemp products.

(R. 143 at 20 n.5, record citations omitted.) Pennington also appeared to have a shaky understanding of the amount of THC in legal products, as the government notes in its response (R. 155 at 17-19), which may cast doubt on the premise of his testing.

In reply, defendant indicates that the government presented no evidence to rebut Pennington's testimony, which included the fact that law enforcement agencies nationwide have conceded the commonsense conclusion that dogs cannot distinguish between hemp and marijuana. (R. 157 at 2.) Defendant submitted a report from the North Carolina State Bureau of Investigation containing a similar statement (Def.'s Ex. 205 at 2), but I see nothing in the record demonstrating a nationwide law enforcement consensus on this issue. Pennington testified that law enforcement agencies have "been varied in their response." (Tr. at 95:17.) It is also worth nothing that Pennington did not fully agree with the North Carolina report and could not clearly explain why dogs alert on hemp. (Tr. at 111.)

Defendant also provides limited data on the number of persons who might be subjected to unwarranted searches unless the law adapts. He cites a report indicating one in three Americans have disclosed using CBD products, a Forbes article estimating CBD sales in the United States, and a map of Milwaukee highlighting stores carrying such

7

products.[2] (R. 151 at 9; R. 151-1.) But this data fails to prove that driving around with hemp or CBD in one's car is such a common occurrence that dog sniffs will routinely expose large numbers of citizens to searches revealing only legal possessions.

In sum, defendant asks this district court to break from Supreme Court and Seventh Circuit precedent based on a record that (1) does not clearly establish that marijuana-trained dogs will routinely alert to CBD or hemp, and (2) even if they do, does not demonstrate the prevalence with which law-abiding citizens may be subjected to unwarranted vehicles searches based on faulty alerts. This is a bridge too far.

Finally, as the government notes, even if the law should be modified as defendant suggests, the officers here were entitled to rely in good faith on the state of the law at the time of the search. (R. 155 at 24.) Defendant offers no reply to this argument. See Plancarte, 2023 U.S. Dist. LEXIS 9812, at *18, 22 (noting that suppression would not be proper even if there is a need to modify existing dog sniff precedent); see also Davis v. United States, 564 U.S. 229, 241 (2011) ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.").

---

[2] In his original motion defendant cited a report indicating 14% of Americans admitted using CBD products. (R. 84 at 6.) The government objects to defendant's submission of new material regarding the use and availability of these products. As the government notes, parties are expected to present all relevant evidence to the magistrate judge. (R. 155 at 20-21.) In reply, defendant contends the court can take judicial notice of his new evidence. (R. 157 at 5.) Even considering the new material, defendant fails to provide a sufficient evidentiary basis for this court to dramatically alter the legal standards applicable to dog sniffs.

## B. Did Zeke's Alert Establish Probable Cause?

### 1. Marijuana v. Hemp

In support of his claim that Zeke's alert, even if not a search, failed to establish probable cause, defendant first repackages his legal argument as a factual one: Zeke's inability to distinguish between marijuana and hemp makes his alerts unreliable. (R. 151 at 10.) Defendant argues that the magistrate judge underestimated the prevalence of hemp and CBD products (R. 10-11), but even if that is so, defendant fails to grapple with the nature of a probable cause determination. As the Tenth Circuit explained in rejecting a similar argument:

> It is undisputed that [drug-detecting canine] Maverick was trained to alert on marijuana, heroin, methamphetamine, and cocaine. If hemp was added to this list of four controlled substances, Maverick's alert on a car would still give rise to a high probability that a controlled substance is in the car as four of the five substances that Maverick could detect are illegal. Thus, we find that the officers had probable cause to search the car regardless of whether Maverick was trained to alert on legal hemp.

United States v. Deluca, No. 20-8075, 2022 U.S. App. LEXIS 23003, at *13-14 (10th Cir. Aug. 18, 2022).

Defendant argues that it does not follow that if a dog is trained to alert to five items, four of which are illegal, then an alert gives a four-in-five chance the alert is for contraband. (R. 151 at 12.) But probable cause requires only a substantial chance of criminal activity, less than a preponderance of the evidence; the mere possibility that Zeke may have alerted to hemp or CBD, rather than one of the illegal substances he was trained to detect, does not mean the officers lacked probable cause to search.

Defendant further argues that, unlike Deluca, he has presented evidence of the prevalence of hemp and CBD. (R. 151 at 12-13.) But just like Deluca, defendant has

"presented no evidence and no argument about how common it is that hemp is found in a vehicle in the absence of other controlled substances." 2022 U.S. App. LEXIS 23003, at *13 n.5.

As with his legal argument based on hemp, defendant cites no decision finding a particular dog sniff unreliable based on the possibility that the canine detected a legal marijuana-related product. He cites United States v. Paniagua-Garcia, 813 F.3d 1013 (7th Cir. 2016), but that case is easily distinguishable. (R. 151 at 13.) There, a police officer saw a motorist holding a cell phone, his head bent toward the phone, and pulled him over based on an Indiana statute forbidding texting and driving. The Seventh Circuit noted that Indiana law permitted drivers to do any number of things with their phones, e.g., making and receiving calls, reading driving directions or maps, retrieving and playing music or audio books, making the most plausible inference from seeing a driver fiddling with his phone that he was not texting. Id. at 1013-14. Defendant presents no evidence suggesting that when a dog like Zeke alerts he is most likely detecting CBD or hemp, as opposed to one of the illegal items on his olfaction palate.

## 2. Training and Certification

### a. Certification

Defendant first argues that Zeke has never been certified. He contends that SPC is merely a training organization, which never tested Zeke in a controlled setting. (R. 151 at 14-15.) But that is not what the evidence showed. As the magistrate judge noted, Mills credibly testified that dogs must satisfactorily complete several phases of his program, including a final test or exercise incorporating "blind hides," in order to pass and receive certification. Mills further testified that he has failed dogs and handlers based on poor

performance, including officers from Wisconsin. (R. 143 at 11-12; Tr. at 175-76.) The record simply does not support defendant's claims that SPC hands out certificates based on participation rather than achievement. (R. 151 at 15.)

In reply, defendant quotes Mills's testimony that in May 2022 he awarded Allard and Zeke a "participation certification." (R. 157 at 4; Tr. at 199:11.) But regardless of the label, the record is clear: Mills evaluated Allard and Zeke's performance before they were recertified to detect narcotics at that time. (Tr. at 184.)

Defendant further argues, based Potter's testimony, that certifications should be issued by a neutral third party, based on known and objective standards, and for a clearly defined period of time. (R. 151 at 15; Tr. at 246.) Under those standards, Potter opined that Zeke was never properly certified. (Tr. at 248.) But Potter admitted that the law does not require neutral third-party certification; this is just best practice.[3] (Tr. at 264.) Defendant cites no case holding these requirements must be satisfied for a certification to be valid. Indeed, Harris rejected "an inflexible set of evidentiary requirements." 568 U.S. at 248. The Court was also willing to overlook the fact that the certification awarded the dog in that case had expired. Id.

### b. Training

Defendant acknowledges that under Harris completion of a proper training program may substitute for certification. But defendant argues Zeke failed to regularly train 16 hours per month, the widely accepted industry standard according to Potter. (R. 151 at 16; Tr. at 250.) Defendant contends that, based on training records, Zeke trained for 55 hours in the six-month period preceding the subject alert, rather than the

---

[3] Potter also admitted he was never a certifying authority. (Tr. at 261.)

recommended 96. (R. 151 at 16-17.) He also notes that Zeke spent only about four hours engaged in specific narcotics detection exercises; he argues that the government provided no authority or testimony as to why a dog/handler team should be credited for time spent on other tasks during a training session. (R. 151 at 17.) Defendant further argues Zeke should have spent more training time on drug searches, which comprise most of his field work. (R. 151 at 18.) Finally, defendant argues that Zeke's attendance at a one-day training seminar in May 2022, shortly before the subject incident, is not enough to save the alert. (R. 151 at 19.)

As the magistrate judge noted, Allard testified that the RCSO holds two eight-hour training sessions each month, and that he and Zeke participated in this training every month except for one month during which Allard's child was born. (R. 143 at 13.) Defendant relies on the training logs, which did not always add up to the recommended number of hours (see Tr. at 138), but even Potter admitted that 16 hours is not a "hard and fast rule" that must be met every month; "there's a certain amount of leeway that's given there." (Tr. at 256; see also Tr. at 284, "There is no legal standard [for training] that anyone is obligated to follow.".) On cross-examination, Potter admitted that in a previous case he testified to a standard of 12 to 16 hours per month. (Tr. at 285.) Potter also conceded that even if a dog fell short of recommended monthly training time, the dog could still be reliable. (Tr. at 285.) Perhaps more importantly, Potter admitted that, according to the records, Zeke was performing well in his training exercises. (Tr. at 286.) Potter also acknowledged that the training Zeke did included most of the things Potter wants to see, e.g., blind scenarios, multiple vehicles, multi-storied buildings, hotel rooms.

12

Case 2:22-cr-00133-LA   Filed 03/28/24   Page 12 of 14   Document 160

(Tr. at 292-93.)[4] Perhaps Zeke could have spent more time on drug detection training, but nothing in the record suggests this materially affected his reliability. Potter testified that training should focus on areas of deficiency. (Tr. at 251.) Since it appears Zeke was doing well in drug detection in both training exercises and in the field, the argument that Zeke's training needed to be refocused to ensure his reliability falls flat.

Defendant's claim that only time spent in active drug detection exercises should count towards training hours also falls flat. The magistrate judge credited Allard's testimony that dogs are not machines; they work in short bursts of energy and need time to rest; doing drug detection work for a full eight hours simply isn't possible. (R. 143 at 16.) The magistrate judge also cited caselaw rejecting the notion that only "nose time" should count towards training. (R. 143 at 14, citing United States v. Smith, No. 6:20-CR-00246-01, 2022 WL 16570060, at *8 (W.D. La. Sept. 30, 2022), adopted, 2022 WL 16558734 (W.D. La. Oct. 31, 2022).) Defendant offers no authority to the contrary.

Finally, defendant provides no reason to discount the testimony from Allard and Mills that the May 2022 recertification lasted three days and included scenarios similar to those included in the original training, such as blind searches and clean areas. (Tr. at 37, 181, 183-84; R. 143 at 12-13.) As the government notes, Zeke passed these tests only weeks before the stop at issue in this case. (R. 155 at 29.)

### IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 143) is adopted, and defendant's motion to suppress (R. 84) is denied. Because I agree

---

[4] Potter testified that he could not evaluate the quality of training Zeke received from SPC. He had no reason to believe SPC is not a competent trainer. (Tr. at 263.)

13

with the magistrate judge that Zeke's alert was reliable, I need not address the government's alternate argument that the search was justified under the collective knowledge doctrine. (See R. 121, 149.)

**IT IS FURTHER ORDERED** that this matter is scheduled for telephonic status on **Friday, April 5, 2024, at 11:30 a.m**. The court finds that the ends of justice served by so continuing the case outweigh the best interest of defendant and the public in a speedy trial. 18 U.S.C. § 3161(h)(7).

Dated at Milwaukee, Wisconsin, this 28th day of March, 2024.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge